IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

KATHERINE CIHA,

Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,[1]

Defendant.

No. C12-0112

RULING ON JUDICIAL REVIEW

TABLE OF CONTENTS

*I.* *INTRODUCTION* ....................................... 2

*II.* *PROCEDURAL BACKGROUND* ............................. 2

*III.* *PRINCIPLES OF REVIEW* ............................... 4

*IV.* *FACTS* ............................................. 6
    *A.* *Ciha's Education and Employment Background* ............. 6
    *B.* *Administrative Hearing Held on December 4, 2009* ........... 6
        *1.* *Ciha's Testimony* ............................... 6
        *2.* *Vocational Expert's Testimony* .................... 8
    *C.* *Administrative Hearing Held on July 14, 2011* ............. 10
        *1.* *Ciha's Testimony* .............................. 10
        *2.* *Vocational Expert's Testimony* ................... 12
    *D.* *Ciha's Medical History* ............................. 12

*V.* *CONCLUSIONS OF LAW* ............................... 18

---

[1] Plaintiff originally filed this case against Michael J. Astrue, the Commissioner of Social Security Administration ("SSA"). On February 14, 2013, Carolyn W. Colvin became Commissioner of the SSA. The Court, therefore, substitutes Commissioner Colvin as the Defendant in this action. FED. R. CIV. P. 25(d)(1).

A.     *ALJ's Disability Determination* . . . . . . . . . . . . . . . . . . . . . . . . . 18
B.     *Objections Raised By Claimant* . . . . . . . . . . . . . . . . . . . . . . . . 21
      1.     *Dr. Brooks' Opinions* . . . . . . . . . . . . . . . . . . . . . . . . . 21
      2.     *McNeal's and Jacob's Opinions* . . . . . . . . . . . . . . . . . . . 26
      3.     *Credibility Determination* . . . . . . . . . . . . . . . . . . . . . . . 28
C.     *Reversal or Remand* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

VI.    *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

VII.   *ORDER* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Katherine Ciha on November 8, 2012, requesting judicial review of the Social Security Commissioner's decision to deny her applications for Title II disability insurance benefits and Title XVI supplemental security income ("SSI") benefits. Ciha asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits and SSI benefits. In the alternative, Ciha requests the Court to remand this matter for further proceedings.

## II. PROCEDURAL BACKGROUND

On November 3, 2008, Ciha applied for both disability insurance benefits and SSI benefits. In her applications, Ciha alleged an inability to work since July 1, 2008 due to fibromyalgia, migraine headaches, insomnia, restless leg syndrome, chronic pain, back and neck pain, and memory loss.[2] Ciha's applications were denied on December 18, 2008. On March 5, 2009, her applications were denied on reconsideration. On March 24, 2009, Ciha requested an administrative hearing before an Administrative Law Judge ("ALJ"). On December 4, 2009, Ciha appeared via video conference with her attorney before ALJ

---

[2] In her request for review of the administrative law judge's initial decision, she amended her disability onset date to February 1, 1993. *See* Administrative Record at 90.

Denzel R. Busick for an administrative hearing. Ciha and vocational expert Elizabeth Albrecht testified at the hearing. In a decision dated January 21, 2010, the ALJ denied Ciha's claims. The ALJ determined that Ciha was not disabled and not entitled to disability insurance benefits or SSI benefits because she was functionally capable of performing work that exists in significant numbers in the national economy. Ciha appealed the ALJ's decision. On December 3, 2010, the Appeals Council denied Ciha's request for review. However, on February 25, 2011, the Appeals Council vacated its December 3, 2010 decision and remanded the case back to the ALJ for resolution of multiple issues, including reconsideration of Ciha's testimony and further consideration of the opinions of one of Ciha's treating doctors.[3]

On July 14, 2011, Ciha appeared via video conference with her attorney before ALJ John E. Sandbothe for a second administrative hearing on remand. Ciha and vocational expert Marian S. Jacobs testified at the hearing. In a decision dated August 25, 2011, the ALJ again denied Ciha's claims. Specifically, the ALJ determined that Ciha was not disabled and not entitled to disability insurance benefits or SSI benefits because she was functionally capable of performing work that exists in significant numbers in the national economy. Ciha appealed the second ALJ decision. On September 4, 2012, the Appeals Council denied Ciha's request for review. Consequently, the ALJ's August 25, 2011 decision was adopted as the Commissioner's final decision.

On November 8, 2012, Ciha filed this action for judicial review. The Commissioner filed an Answer on January 18, 2013. On February 19, 2013, Ciha filed a brief arguing that there is not substantial evidence in the record to support the ALJ's finding that she is not disabled and that she is functionally capable of performing work that exists in significant numbers in the national economy. On April 17, 2013, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and

---

[3] *See* Administrative Record at 89-90.

asking the Court to affirm the ALJ's decision. On April 29, 2013, Ciha filed a reply brief. On January 3, 2013, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

### III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). Title 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012);

4

*see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Ciha's Education and Employment Background

Ciha was born in 1984. She is a high school graduate. She also studied esthetics and cosmetology following high school. Ciha testified that her last job was in December 2008, when she worked part-time (13-14 hours per week) as a hairstylist.

The record contains a detailed earnings report for Ciha. The report covers the time period of 2001 to 2010. During the time period of 2001 to 2007, Ciha earned no more than $3,046.98, which she earned in 2003. In 2008, she earned $8,674.53. She has no earnings since 2009.

### B. Administrative Hearing Held on December 4, 2009

### 1. Ciha's Testimony

At the administrative hearing, the ALJ inquired why Ciha believed she was incapable of working a full-time job. Ciha responded that she was prevented from working due to severe back pain, foot pain, leg pain, and severe fatigue. Next, the ALJ asked Ciha a series of questions regarding her functional capabilities:

> Q: Okay. Now let's talk a little bit about some of your physical functioning. How long can you stand or walk combined, basically stay on your feet before you feel like you have to sit down?
> A: It'd be a maximum of 30 minutes. . . .
> Q: Okay. How long can you sit as a general rule before you have to stand up?
> A: Anywhere from about 45 minutes to an hour.
> Q: And how much weight would you estimate on average you're able to pick up and carry?
> A: I don't know how much. I mean the way I would normally be able to do is maybe 10, 15 pounds at the most.

(Administrative Record at 37-38.)

The ALJ also inquired about Ciha's activities of daily living:

> Q: How do you do with your housework, are you able to keep up with your housework okay?
>
> A: It all depends on whether it's a good day or bad day.
>
> Q: Okay. Well let's first take a good day. Now on a good day would you be able to vacuum the carpeting in the house?
>
> A: If it's a really good day, yes.
>
> Q: And how about sweeping, mopping, doing those kinds of chores, can you do those kinds of things?
>
> A: No, I don't mop, I could sweep.
>
> Q: Do you do the cooking for the family?
>
> A: Yes, I do.
>
> Q: Do the laundry?
>
> A: Yes.
>
> Q: Let's take a bad day, on a bad day would you be able to vacuum the carpeting?
>
> A: No.
>
> Q: If we talk about good days and bad days in a typical week how many good days do you have, how many bad days do you have?
>
> A: Maybe one to two good days.
>
> Q: What do you attribute that to, is it pain, discomfort, is it depression, can you give me an idea as to what a bad day would consist of?
>
> A: Mostly pain, a lot of muscle spasming, very fatigued, really, really, tough to move, get up and going, very sore and stiff.

(Administrative Record at 41-42.) Ciha further stated that when she is fatigued, she sometimes takes a nap during the day, lasting about 1 hour.

Ciha's attorney also questioned Ciha. Ciha's attorney asked Ciha to rate her pain on a given day:

> Q: You started to describe pain but you didn't say the severity. If you're going to rate your pain zero, ten on a normal day, we'll say a good day versus a bad day. On a good day what's your pain level on a zero, ten scale?
>
> A: Maybe four to five.

7

| Q: | Okay. And then on a really bad day? |
|----|-----|
| A: | Close to a ten, yeah, seven, eight, nine. |
| Q: | Okay, and -- |
| A: | Horrible, horrible day would be about a nine, ten. |
| Q: | Okay. So what do you, how do you, how do you handle that kind of pain? |
| A: | My medicines, I usually -- |
| Q: | Do you have rescue medicine, pain medicine? |
| A: | Usually, yeah, usually I have a painkiller that on a really, really horrible day I'm able to take which helps for a few hours. |

(Administrative Record at 46.) Ciha further explained that she has a prescription for Vicodin to help her alleviate pain on her worst days. She stated that the prescription is for about 15-20 pills at a time, and it takes approximately 3 months to go through the pills. Ciha's attorney also asked Ciha to describe how fibro-fog affects her. According to Ciha, fibro-fog affects her memory. She stated "I'll just forget simple little things or I'll be trying to think of something or remember something and then it'll just go away."[4]

### 2. Vocational Expert's Testimony

At the hearing, the ALJ provided vocational expert Elizabeth Albrecht with a hypothetical for an individual who:

> can work in a light level, pick up 20 pounds occasionally, 10 pounds frequently, sit six hours out of an eight-hour workday, stand and walk combined about six hours with normal work breaks. No limitation in the operation of hand controls, climb stairs occasionally, should avoid ladders, scaffolds or ropes. They can balance, crouch, kneel, stoop or crawl but only occasionally. No manipulation limits, no visual limits with glasses, no communication limits and no major environmental limits. This person does have pain and discomfort and from a variety of sources. It produces mild to moderate chronic pain and discomfort noticeable at all times, with appropriate medication they can be active at the physical levels I have

---

[4] Administrative Record at 49.

> described but it would at all times have some mild up to sometimes moderate limits on concentration, persistence and pace which would be variable and they would work with a somewhat variable pace such that they would be moderately limited in the ability to carry out details, moderately limited in the ability to maintain extended concentration, moderately limited in the ability to adapt to changes in the work place or their work setting. As I say those are variable so that one could suspect that up to one-third of the time they may be in the moderate range of difficulty such that the activity would be noticeably affected but not precluded up to one-third of the time.

(Administrative Record at 56-57.) The vocational expert testified that under such limitations, Ciha could perform the following work: (1) marker (2,300 positions in Iowa and 187,000 positions in the nation), (2) counter clerk (500 positions in Iowa and 59,000 positions in the nation), and (3) assembler of printed matter (5,400 positions in Iowa and 375,000 positions in the nation). The ALJ provided the vocational expert with a second hypothetical which was identical to the first hypothetical, except that the individual "may be down to sedentary such as they pick up 15 pounds occasionally and less than 10 frequently, sit a total of six hours out of an eight-hour workday, stand and walk combined a total of three."[5] The vocational expert testified that under such limitations, Ciha could perform the following work: (1) final assembler (900 positions in Iowa and 60,000 positions in the nation), (2) order clerk (250 positions in Iowa and 18,000 positions in the nation), and (3) telequote clerk (1,000 positions in Iowa and 99,000 positions in the nation). Lastly, the ALJ provided the vocational expert with a third hypothetical:

> Q: Now if I've got the same person at a sedentary level assume that they would be moderately limited at all times in regards to pace such that they would be working at a notably slower pace than the average worker secondary to pain and fatigue. And their pace

---

[5] Administrative Record at 59.

> over the long term would probably be reduced by about 20 to 25 percent over the long term in a job. Would they be able to maintain any of the jobs you've described thus far?
>
> A:   If in the jobs I mentioned the individual would work at a slower pace then the average worker, say getting down to say 20 to 25 percent of the job at a slow pace, in my opinion that would preclude competitive employment.

(Administrative Record at 60.)

Ciha's attorney also questioned the vocational expert. First, Ciha's attorney inquired whether the hypothetical individual would be employable if he missed four or more days of work per month due to his or her impairments and treatment of those impairments. The vocational expert responded that such a limitation would preclude full-time employment. Second, Ciha's attorney asked whether taking "frequent breaks and during the frequent breaks you'd need to at least lie down on the worksite and the breaks would be four to five per eight-hour shift in addition to the normal work breaks, would an employer allow for that?"[6] The vocational expert responded that under such a limitation, the individual would be precluded from competitive employment.

### C. Administrative Hearing Held on July 14, 2011

#### 1.  Ciha's Testimony

At the second administrative hearing, Ciha's attorney asked Ciha to describe the pain she felt due to her fibromyalgia. Ciha testified that "I have severe back pain that's constant all the time, I have severe neck pain that's constant all the time. I get, when I get stressed out it gets a lot worse. I also have restless leg syndrome, I have insomnia all kind of contributing to my fibromyalgia."[7] Ciha's attorney asked Ciha to rate her current pain

---

[6] Administrative Record at 60.

[7] *Id.* at 550.

level at the time of the hearing. Ciha rated her pain at 5 or 6 on a scale of 1 to 10, with 10 being the most severe pain. Ciha's attorney inquired about what aggravates Ciha's pain. Ciha responded that:

> . . . stress really, really starts to affect it. I get very, very, very sore, I get very, very tired, fatigued, exhausted. Standing up for long periods of time start to bother my back and my hips. Sitting down for long periods of time will bother my back and hips, walking for a long period of time starts bothering my back a lot and my knee.

(Administrative Record at 551-52.) Ciha also stated that a side effect of her fibromyalgia is fatigue and exhaustion, "I feel like I can't fully function correctly, I'm just exhausted and drained."[8] Ciha further testified that she has difficulty sleeping due to her pain, and gets headaches regularly throughout the week. According to Ciha, some of the headaches turn into migraine headaches if she is unable to lie down and take it easy when the headache starts.

Additionally, Ciha's attorney asked Ciha to describe her typical day:

> My average day is basically I wake up, I generally stay in bed for a couple hours, try to loosen, try to let my body loosen up and get my medicine into my system. Once my medicine is into my system I, I try to make an effort to get up and you know do what I can. My husband, who has cut back a lot of hours at his job, he's in fact switched jobs. He only works about 18 hours a week so he's home a lot with me so he gets up and tends to the kids, gets them going and what they need. And I'll you know rest and get up if I can and try to get what I can done. I generally lay down a lot. I'll lay down on the couch or I'll lay down in bed but I lay down a lot.

(Administrative Record at 559.)

---

[8] *Id.* at 552.

## 2. *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Marian Jacobs with a hypothetical for an individual who:

> could lift 20 pounds occasionally, 10 pounds frequently but she can only be on her feet two hours total during a workday. She can only occasionally balance, stoop, crouch, kneel, crawl, climb.

(Administrative Record at 565.) The vocational expert testified that under such limitations, Ciha could perform the following work: (1) addresser and sorter of envelopes (240 positions in Iowa and 24,000 positions in the nation), (2) call-out operator (124 positions in Iowa and 15,000 positions in the nation), and (3) surveillance system monitor (200 positions in Iowa and 25,000 positions in the nation). The ALJ provided the vocational expert with a second hypothetical which was identical to the first hypothetical, except that the individual would need "two or more absences per month and a slow pace for up to one-third of the day[.]"[9] The vocational expert testified that with such additional limitations, Ciha would be precluded from competitive employment.

### D. *Ciha's Medical History*

On October 20, 1994, at age 10, Ciha met with Dr. James W. Turner, M.D., complaining of back pain. Dr. Turner noted that in February 1993, Ciha "was bounced up out of her seat on a school bus. She was seen in the emergency room because she was having back discomfort. It was felt that she may have had some compression at T5-T6."[10] Dr. Turner indicated that Ciha was doing "quite well" until she started school in the fall, and physical education exercises caused discomfort in her back. Ciha also reported chiropractic treatments that caused her back discomfort. Upon examination, Dr. Turner found Ciha to be physically "completely normal." Dr. Turner recommended that Ciha

---

[9] Administrative Record at 565.

[10] *Id.* at 344.

discontinue chiropractic treatment and start physical therapy to strengthen her back and add flexibility.

In May 1995, Ciha returned to Dr. Turner complaining of "lots" of mid-back pain that was not exercise-related. Dr. Turner found Ciha's neurological exam to be "totally normal." Dr. Turner also found "no abnormalities" on new x-rays of Ciha's back. Dr. Turner concluded that "I really cannot find anything objective and at this point I would allow activities as tolerated."[11]

Also in May 1995, Ciha was referred to Dr. Laurence S. Krain, M.D., for a neurological consultation. Dr. Krain noted that:

> [Ciha] is a 10-year-old right handed girl with a history of severe headaches. These apparently started around age 2 or 3. They are very severe and disabling. She said it feels 'like a rope trying to be pulled apart.' They are frontal. They are associated with nausea, vomiting, photophobia and phonophobia. They typically tend to start around 1:00 to 2:00 in the afternoon and last until the next morning. Occasionally, they last three to four days. She has one about once a week until a couple of weeks ago, at which point she has had none.

(Administrative Record at 338.) Dr. Krain also noted that Ciha had been absent "nearly" a month from school due to the severity of her headaches. Upon examination, Dr. Krain determined that Ciha was neurologically intact, and diagnosed her with migraine headaches without aura. Dr. Krain recommended medication as treatment.

In September 1995, Ciha returned to Dr. Krain for a follow-up appointment. Dr. Krain found that her headaches were not improved. Dr. Krain noted that Ciha "is having about one headache a week which is disabling, severe, and associated with nausea and vomiting."[12] Upon examination, Dr. Krain diagnosed Ciha with persistent migraine

---

[11] Administrative Record at 344.

[12] *Id.* at 343.

headaches. Dr. Krain continued to treat her with medication. On follow-up visits in December 1995 and January 1996, Dr. Krain found that Ciha's headaches were "responding nicely" to medication, and she was doing "very well."

In July 1996, Ciha met with Dr. Michael S. Brooks, M.D., concerning her chronic back pain. Upon examination, Dr. Brooks diagnosed Ciha with chronic pain syndrome and positive ANA of uncertain significance. Dr. Brooks recommended further testing and medication as treatment. Ciha met with Dr. Brooks in September 1996 for a follow-up appointment. Dr. Brooks found that Ciha's chronic pain syndrome had not improved, and treated her with new medication. In March 1997, Ciha continued to have difficulty with back pain. Dr. Brooks recommended both physical exercise and water exercise as treatment. Ciha continued to have follow-up appointments with Dr. Brooks through 1997, with little change.

Ciha next met with Dr. Brooks in October 2002, when she was 18 years old. Dr. Brooks noted that Ciha is "experiencing significant pain and stiffness throughout her back, neck, anterior chest wall and [to] some degree the upper arms and thighs."[13] Upon examination, Dr. Brooks diagnosed Ciha with fibromyalgia, asthma, migraine headaches, and history of depression. Dr. Brooks recommended physical therapy and medication as treatment.

On December 3, 2008, Ciha was referred by Disability Determination Services ("DDS") to Dr. Danice F. Klimek, M.D., for a consultative examination. In reviewing Ciha's medical history, Dr. Klimek noted that:

> [Ciha] states she was diagnosed with fibromyalgia in 1996 by Dr. Brooks after x-rays, blood tests and pressure point testing. She states she was started on medications at that time. . . . She states that the medications do help, though they make her quite drowsy. She complains of a constant, dull, aching pain

---

[13] Administrative Record at 349.

> in her back and neck, which is made worse with standing for
> long periods of time, changes in weather, overexertion,
> walking and standing or sitting for long periods of time. She
> states her symptoms are made better with pain medications and
> lying in bed. She states she is never pain-free, and at best her
> pain is 6/10, on average is 7.5/10, and worst is 10/10.

(Administrative Record at 406.) Upon examination, Dr. Klimek concluded that Ciha's "physical was remarkable only for 11 out of 18 positive pressure points. The remainder of the physical examination was essentially unremarkable."[14] Dr. Klimek concluded that Ciha had no physical limitations.

On December 5, 2008, Ciha was referred by DDS to Michele McNeal, Ed.S., and Joan M. Jacob, M.A., for a mental status exam. McNeal and Jacob noted that Ciha worked at JC Penney Salon, but after 2 months on the job she had to reduce her hours, eventually reducing them to working 3 days per week "to better manage and cope with her fibromyalgia symptoms."[15] Ciha also reported that "I have pain all the time, but after standing and working I start having muscle spasms in my neck and back. I can't do anything but sit or lie down."[16] Upon examination, McNeal and Jacob diagnosed Ciha with adjustment disorder with depressed mood, fibromyalgia, restless leg syndrome, and chronic back and neck pain. McNeal and Jacob opined that:

> Impediments to [Ciha's] fulltime employment appear to be
> primarily related to her physical conditions, which would need
> to be evaluated in light of medical evidence. [She] appears to
> have the skills to understand and remember simple to
> moderately complex instructions, procedures and locations.
> Due to her pain and fatigue, it is possible [Ciha] will have
> difficulty maintaining the pace expected, particularly over the

---

[14] Administrative Record at 408.

[15] *Id.* at 402-03.

[16] *Id.* at 403.

long term. . . . Although her concentration appeared intact throughout the present interview, it is probable some disruption of attention and concentration exists related to her level of pain or fatigue. With training and practice, it is likely [Ciha] will be able to learn new tasks and adjust to changes.

(Administrative Record at 405.)

On December 18, 2008, Dr. John Tedesco, Ph.D., reviewed Ciha's medical records and provided DDS with a Psychiatric Review Technique assessment for Ciha. Dr. Tedesco diagnosed Ciha with adjustment disorder with depressed mood. Dr. Tedesco determined that Ciha had the following limitations: no restriction of activities of daily living, no difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. Dr. Tedesco concluded that:

[The medical evidence] indicates no treatment by a mental health professional. [Ciha] attended a [consultative examination] at DDS request and findings . . . were essentially unremarkable. Mood was described as down and affect was flat. She appeared physically exhausted. Cognitive functioning was intact. . . . Work limitations were seen as secondary to her physical complaints. . . . The mental impairment does not result in significant functional limitations and is considered non severe.

(Administrative Record at 427.)

Also on December 18, 2008, Dr. James D. Wilson, M.D., reviewed Ciha's medical records and provided DDS with a physical residual functional capacity ("RFC") assessment for Ciha. Dr. Wilson determined that Ciha could: (1) occasionally lift and/or carry 20 pounds, (2) frequently lift and/or carry 10 pounds, (3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Wilson also determined that Ciha could occasionally climb,

balance, stoop, kneel, crouch, and crawl. Dr. Wilson found no manipulative, visual, communicative, or environmental limitations.

On March 27, 2009, Ciha met with Dr. Brooks for re-evaluation of her fibromyalgia. Dr. Brooks noted that Ciha "has chronic diffuse pain which is worse with increased activity such as standing or walking for longer periods of time and worse with stress as well as weather changes."[17] Dr. Brooks further noted that:

> Lying down tends to help with the pain but even sitting for prolonged periods of time can be difficult. She has tried several jobs over the last year or 2 including working at Dairy Queen, telemarketing and hairstyling none of which she could keep up with for more than short periods of time due to [] her pain and fatigue. Medications have helped to some degree but only partially and have been associated with daytime fatigue. She has difficulty sleeping at night both in terms of getting to sleep and staying asleep[.]

(Administrative Record at 461.) Upon examination, Dr. Brooks diagnosed Ciha with fibromyalgia. Dr. Brooks opined that:

> I would consider her to be limited in terms of her activities at this point based upon the severe fatigue, diffuse muscle aches and joint pains and confusion associated with some of her medications. She has been consistent in these types of complaints over a number of years and I do not think that she is either fabricating these complaints or malingering. I would limit her to activities that do not require standing or walking for more than 30 minutes at a time and do not require sitting for more than an hour at a time without being able to get up and change positions. I would expect under the present circumstances that she will need to take more frequent breaks and lie down to rest during the day regardless of what activity she is taking part in. Lifting should be limited to no more than 15 pounds in frequently [sic] and no more than 5 pounds on a frequent basis. Bending, kneeling, squatting and crawling

---

[17] Administrative Record at 461.

should be done only very infrequently. She should not be exposed to the extremes of temperatures as this would be expected increase her symptomatology. Her medications can be expected to cause both fatigue and some difficulty with mental function especially if the dosage is pushed for control of her pain. I have recommended a graduated exercise program with some form of aerobic exercise to be tried daily and progressively increased as tolerated.

(Administrative Record at 465.)

On the same date and at the request of Ciha's attorney, Dr. Brooks also filled out a Fibromyalgia RFC Questionnaire. Dr. Brooks diagnosed Ciha with fibromyalgia and depression. Dr. Brooks indicated that Ciha's prognosis was "guarded." Dr. Brooks identified the following symptoms for Ciha: multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, frequent and severe headaches, and depression. According to Dr. Brooks, changing weather, fatigue, movement/overuse, cold, stress, and static positioning all precipitate Ciha's pain. Dr. Brooks also opined that Ciha's daily experience of pain would occasionally interfere with her attention and concentration during the course of an eight-hour workday. Dr. Brooks found that Ciha could stand/walk less than 2 hours in an eight-hour workday, and sit for about 4 hours in an eight-hour workday. Dr. Brooks also determined that Ciha would need two unscheduled breaks periodically throughout and eight-hour workday. Lastly, Dr. Brooks opined Ciha would miss more than four days of work per month due to her impairments or treatment for her impairments.

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Ciha is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g); *Bowen v. Yuckert,*

482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant

work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC [(residual functional capacity)], age, education, and work experience, there [are] a significant number of other jobs in the national economy that [the claimant] could perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. §§ 404.1545, 416.945.

The ALJ applied the first step of the analysis and determined that Ciha had not engaged in substantial gainful activity since February 1, 1993. At the second step, the ALJ concluded from the medical evidence that Ciha had the following severe impairments: fatigue secondary to fibromyalgia, migraine headaches, restless leg syndrome, and depression. At the third step, the ALJ found that Ciha did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Ciha's RFC as follows:

> [Ciha] has the residual functional capacity to perform light work . . . involving lifting 20 pounds occasionally and 10 pounds frequently; standing and walking a total of 2 hours in an 8 hour work day; and only occasionally balancing, stooping, crouching, kneeling, crawling, and climbing.

(Administrative Record at 15.) Also at the fourth step, the ALJ determined that Ciha did not have any past relevant work. At the fifth step, the ALJ determined that based on her age, education, previous work experience, and RFC, Ciha could work at jobs that exist in

significant numbers in the national economy. Therefore, the ALJ concluded that Ciha was not disabled.

## B. Objections Raised By Claimant

Ciha argues that the ALJ erred in two respects. First, Ciha argues that the ALJ failed to properly evaluate the opinions of her treating physician, Dr. Brooks, and the opinions of consultative examiners, Michele McNeal and Joan Jacob. Second, Ciha argues that the ALJ failed to properly evaluate her subjective allegations of pain and disability.

### 1. Dr. Brooks' Opinions

Ciha argues that the ALJ failed to properly evaluate the opinions of her treating physician, Dr. Brooks.[18] Specifically, Ciha argues that the ALJ failed to adequately

---

[18] In her brief, the Commissioner argues that Dr. Brooks was not a treating physician because there are significant gaps in his treatment of Ciha. *See* Commissioner's Brief (docket number 13) at 14. Ciha disputes the Commissioner's argument. Specifically Ciha contends that:

> Defendant cites 20 CFR 404.1502 for the proposition that a treating source must be currently treating the claimant on an ongoing basis. This is incorrect. 20 CFR 404.1502 states, "Treating source means your own physician . . . who has, or has had, an ongoing relationship with you." Clearly Dr. Brooks "had an ongoing treatment relationship" with [Ciha] until her family lost health insurance. He saw her every 2-3 months from July 1996 through October 1997. She resumed treatment with him in 2002 and again from 2009 through 2011. He is the only rheumatologist to have treated her for this condition, and he is in the best position to offer an opinion about her condition from 1996 onward.

Ciha's Reply Brief (docket number 14) at 4-5. While the Commissioner offers a reasonable argument based on the significant gaps in Dr. Brooks' treatment of Ciha, the Court is persuaded by Ciha that, as her only treating rheumatologist, Dr. Brooks should be regarded as a treating source. More significantly, the Court is also persuaded that Dr. Brooks should considered a treating source because the ALJ in his decision treated Dr. Brooks as a treating source. *See* Administrative Record at 21. Therefore, the Court

(continued...)

explain his reasons for discrediting the opinions of Dr. Brooks. Ciha concludes that the "ALJ's failure to credit the treating doctor's opinions is reversible error."[19]

An ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). The opinion of a treating physician:

> should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted).

"Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.' *Id.*"); *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC assessment if it is inconsistent with other substantial evidence in the record); *Cabrnoch v.*

---

[18](...continued)
considers Dr. Brooks a treating source for purposes of this Social Security appeal.

[19] Ciha's Brief (docket number 12) at 16.

22

*Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ).

The regulations also require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The regulations also require an ALJ to give "good reasons" for rejecting statements provided by a treating physician. *Id.*; *see also Tilley v. Astrue*, 580 F.3d 675, 680 (8th Cir. 2009) ("The regulations require the ALJ to 'always give good reasons' for the weight afforded to the treating source's opinion.") (citation omitted).

In treating Ciha, Dr. Brooks initially diagnosed her with chronic pain syndrome, and later with fibromyalgia. Among a variety of opinions in the record regarding his diagnosis of fibromyalgia, Dr. Brooks opined in 2009 that:

> I would consider [Ciha] to be limited in terms of her activities at this point based upon the severe fatigue, diffuse muscle aches and joint pains and confusion associated with some of her medications. She has been consistent in these types of complaints over a number of years and I do not think that she is either fabricating these complaints or malingering. I would limit her to activities that do not require standing or walking for more than 30 minutes at a time and do not require sitting for more than an hour at a time without being able to get up and change positions. I would expect under the present circumstances that she will need to take more frequent breaks and lie down to rest during the day regardless of what activity she is taking part in. Lifting should be limited to no more than 15 pounds in frequently [*sic*] and no more than 5 pounds on a frequent basis. Bending, kneeling, squatting and crawling should be done only very infrequently. She should not be exposed to the extremes of temperatures as this would be expected increase her symptomatology. Her medications can be expected to cause both fatigue and some difficulty with mental function especially if the dosage is pushed for control of her pain. I have recommended a graduated exercise program with some form of aerobic exercise to be tried daily and progressively increased as tolerated.

(Administrative Record at 465.)[20]

In his decision, the ALJ summarized a portion of these opinions, but did address all of Dr. Brooks' opinions regarding Ciha's functional abilities.[21] In weighing Dr. Brooks' opinions, the ALJ concluded:

> The undersigned considered the opinion of the treating rheumatologist, Dr. Brooks; however, controlling weight is not given to the opinion because it is not well supported by objective evidence and appears inconsistent with [Ciha's] reported activities of daily living. Furthermore, it appears that the rheumatologist relied quite heavily on [Ciha's] subjective complaints. Although controlling weight is not accorded to the opinion of Dr. Brooks, some weight is given to the opinion given that part of the restrictions have been incorporated into the residual functional capacity conclusion reached by the undersigned.

(Administrative Record at 21.) While the ALJ offers three reasons for discounting the opinions of Dr. Brooks, the ALJ does not adequately address or explain his reasons for finding Dr. Brooks' opinions to not be accorded "controlling" weight. Instead, the ALJ simply makes conclusory observations that Dr. Brooks' opinions are not supported by objective evidence, are inconsistent with Ciha's activities of daily living, and are based on Ciha's subjective complaints. The ALJ does not address, however, any "objective medical evidence" or the inconsistencies in Ciha's activities of daily living that he relied on in determining that Dr. Brooks' opinions should not be accorded "controlling" weight. Furthermore, having reviewed the medical evidence in the record in its entirety, the Court finds that Ciha consistently exhibited symptoms associated with fibromyalgia, as diagnosed

---

[20] *See also* Administrative Record at 469-472 (Dr. Brooks' responses to a fibromyalgia RFC questionnaire providing additional opinions on Ciha's functional limitations).

[21] *See* Administrative Record at 20.

24

by Dr. Brooks, including difficulty sleeping, fatigue, and pain. *See Forehand v. Barnhart*, 364 F.3d 984, 987 (8th Cir. 2004) (providing that sleep deprivation, fatigue and pain are consistent with fibromyalgia); *see also Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) (Explaining that fibromyalgia "leads to distinct sleep derangement which often contributes to a general cycle of daytime fatigue and pain."). Thus, without further explanation, it is difficult for the Court to understand how the objective medical evidence does not support Dr. Brooks' opinions. Moreover, in *Forehand*, the Eighth Circuit Court of Appeals found that when considering a claimant with fibromyalgia, the "ability to engage in some life activities, however, does not support a finding that she retains the ability to work." 364 F.3d at 988; *see also Brosnahan v. Barnhart*, 336 F.3d 671, 677 (8th Cir. 2003) ("[W]e have held, in the context of a fibromyalgia case, that the ability to engage in activities such as cooking, cleaning, and hobbies, does not constitute substantial evidence of the ability to engage in substantial gainful activity."). Again, without further explanation, it is difficult for the Court not to question the ALJ's conclusion that Dr. Brooks' opinions are inconsistent with Ciha's activities of daily living.

In reviewing the ALJ's decision, the Court bears in mind that an ALJ has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts v. Apfel*, 143 F.3d 1134, 1138 (8th Cir. 1998) (quotation omitted). Furthermore, if an ALJ rejects the opinions of a treating physician, the regulations require that the ALJ give "good reasons" for rejecting those opinions. *See* 20 C.F.R. § 404.1527(d)(2). The Court finds that the ALJ has not fully met these requirements. The ALJ did not provide any reasons other than conclusory statements, let alone "good reasons," for not granting "controlling" weight to Dr. Brooks' opinions. Therefore, the Court finds that this matter should be remanded so that the ALJ may fully

and fairly develop the record with regard to Dr. Brooks' opinions. On remand, the ALJ shall provide clear reasons for accepting or rejecting Dr. Brooks' opinions and support his reasons with evidence from the record.

## 2. McNeal's and Jacob's Opinions

Ciha argues that the ALJ failed to properly evaluate the opinions of McNeal and Jacob, consultative examiners. Specifically, Ciha asserts that the ALJ should not have discounted McNeal's and Jacob's opinions regarding her difficulties with concentration and pace. Ciha concludes that "[t]he ALJ's rejection of Ms. McNeal's opinion . . . constitutes error."[22]

An ALJ is required to evaluate every medical opinion he or she receives from a claimant. 20 C.F.R. § 404.1527(d). If the medical opinion is not from a treating source, then the ALJ considers the following factors for determining the weight to be given to the non-treating medical opinion: "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese v. Astrue*, 552 F.3d 728, 731 (8th Cir. 2009) (citing 20 C.F.R. §§ 404.1527(d)). An ALJ is also required to "'explain in the decision the weight given to the opinions of a State agency medical . . . consultant[.]'" *Wilcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir. 2008) (quoting 20 C.F.R. § 404.1527(f)(2)(ii)).

An ALJ also has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*, 36 F.3d 43, 44 (8th Cir. 1994)); *see also Smith v. Barnhart*, 435 F.3d 926, 930 (8th Cir. 2006) ("A social security hearing is a non-

---

[22] Ciha's Brief (docket number 12) at 15.

26

adversarial proceeding, and the ALJ has a duty to fully develop the record."). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citation omitted).

On December 5, 2008, Ciha was referred by DDS to McNeal and Jacob for a mental status exam. McNeal and Jacob opined that:

> Impediments to [Ciha's] fulltime employment appear to be primarily related to her physical conditions, which would need to be evaluated in light of medical evidence. [She] appears to have the skills to understand and remember simple to moderately complex instructions, procedures and locations. Due to her pain and fatigue, it is possible [Ciha] will have difficulty maintaining the pace expected, particularly over the long term. . . . Although her concentration appeared intact throughout the present interview, it is probable some disruption of attention and concentration exists related to her level of pain or fatigue. With training and practice, it is likely [Ciha] will be able to learn new tasks and adjust to changes.

(Administrative Record at 405.) In considering McNeal's and Jacob's opinions, the ALJ gave:

> little weight to the opinion of the examining psychologist, [] McNeal, because the opinion was not consistent with mental status examination and activities of daily living. Furthermore, the psychologist provided an opinion outside the area of her expertise based on the statement that impediments to full-time employment primarily appeared to be due to physical condition and [Ciha] may experience difficulty maintaining expected attention, concentration, and pace due to pain and fatigue.

(Administrative Record at 21.)

Here, the ALJ considered McNeal's and Jacob's opinions and determined that "little weight" should be given to their opinions because they were not consistent with their own examination of Ciha, or Ciha's activities of daily living. The ALJ also found that their

opinions deserved less weight because they opined on issues outside their area of expertise. The Court finds that the ALJ properly articulated his reasons for granting "little weight" to McNeal's and Jacob's opinions. *See Wagner*, 499 F.3d at 848 ; *see also Wiese*, 552 F.3d at 731 (providing that specialization is factor to consider in weighing the opinions of a non-treating source). Moreover, the Court believes that Ciha overreaches with her argument. For example, McNeal and Jacob did not opine that Ciha could not work a full-time job because she had difficulties with concentration and pace. Instead they opined that is was "possible" Ciha would have difficulty maintaining the pace necessary for a full-time job, and would *probably* have "some" difficulties with attention and concentration based on her level of pain and fatigue.[23] Accordingly, the Court finds that the ALJ properly considered McNeal's and Jacob's opinions and addressed them in his decision. *See Wagner*, 499 F.3d at 848. Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 3. Credibility Determination

Ciha argues that the ALJ failed to properly evaluate her subjective allegations of pain and disability. Ciha maintains that the ALJ's credibility determination is not supported by substantial evidence. The Commissioner argues that the ALJ properly considered Ciha's testimony, and properly evaluated the credibility of her subjective complaints.

When assessing a claimant's credibility, "[t]he [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage,

---

[23] Administrative Record at 405.

effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). An ALJ should also consider a "a claimant's work history and the absence of objective medical evidence to support the claimant's complaints[.]" *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (citing *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000)). The ALJ, however, may not disregard a claimant's subjective complaints "'solely because the objective medical evidence does not fully support them.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting *Wiese v. Astrue*, 552 F.3d 728, 733 (8th Cir. 2009)).

Instead, an ALJ may discount a claimant's subjective complaints "if there are inconsistencies in the record as a whole." *Wildman*, 596 F.3d at 968; *see also Finch*, 547 F.3d at 935 (same); *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole."). If an ALJ discounts a claimant's subjective complaints, he or she is required to "'make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the Polaski factors.'" *Renstrom*, 680 F.3d at 1066 (quoting *Dipple v. Astrue*, 601 F.3d 833, 837 (8th Cir. 2010)); *see also Ford*, 518 F.3d at 982 (An ALJ is "required to 'detail the reasons for discrediting the testimony and set forth the inconsistencies found.' *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)."). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (providing that deference is given to an ALJ when the ALJ explicitly discredits a claimant's testimony and gives good reason for doing so); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly

discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination."). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)).

In his decision, the ALJ determined that:

> After careful consideration of the evidence, the undersigned finds [Ciha's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Ciha's] statements concerning the intensity, persistence, and limiting effects of the symptoms are not fully credible. The record reflects [Ciha] made inconsistent statements regarding matters relevant to the issue of disability. For instance, although [she] reported spending her days lying in bed, she conversely indicated she had been working as a stylist 14 to 15 hours per week. [She] related to another consultative examiner, Dr. McNeal, that she 'can't do anything but sit or lie down.' However [Ciha] conversely reported activities of daily living including caring for her personal needs, caring for her three young children, making lunch, playing with her children, socializing with friends 'every once in awhile,' using the internet, maintaining a financial account accurately, and driving. The activities are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. There is evidence that [Ciha] was not compliant in taking prescribed medications, suggesting symptoms may not have been as limiting as alleged. . . . [Ciha] admitted to certain abilities which provide support for part of the residual functional capacity conclusion in this decision. For these reasons, the undersigned finds [Ciha] has been less than credible regarding her allegations of total disability.

(Administrative Record at 21.)

It is clear that the ALJ considered the regulations, *Polaski* factors, and medical records in making his credibility determination.[24] What is less clear, and somewhat troubling to the Court, is whether the ALJ *accurately* considered the entire record and all the *Polaski* factors in addressing Ciha's subjective allegations of pain and disability. For example, while the ALJ states that Ciha reported to a consultative examiner that "she 'can't do anything but sit or lie down,'" what Ciha actually told the consultative examiner was that "after standing and working I start having muscle spasms in my neck and back. I can't do anything but sit or lie down."[25] Similarly, the ALJ states that "[t]here is evidence that [Ciha] was not compliant in taking prescribed medications, suggesting symptoms may not have been as limiting as alleged," but the ALJ points to no evidence in the record to support this assertion. As Ciha points out, the only evidence in the record of noncompliance with medication occurred when she was 11 and 12 years old and her parents decided to have her stop taking two specific medications.[26] The Court is unconvinced that this is a legitimate reason for discrediting Ciha's testimony. Finally, the ALJ asserts that Ciha "admitted to certain abilities which provide support for part of the residual functional capacity conclusion in this decision," but points to nothing in the record to support his assertion, or explain what abilities support his conclusion.

Accordingly, the Court finds that the ALJ failed to set forth the requisite detailed reasons for discrediting Ciha's testimony, and fully explain the inconsistencies in the record. *See Ford*, 518 F.3d at 982 (providing that an ALJ must "'detail the reasons for discrediting the testimony and set forth the inconsistencies found.'") (quotation omitted); *Baker*, 159 F.3d at 1144 ("When rejecting a claimant's complaints of pain, the ALJ must

---

[24] *See* Administrative Record at 15-16, 21.

[25] *Id*. at 403.

[26] *See* Administrative Record at 364, 367.

make an express credibility determination, must detail reasons for discrediting the testimony, must set forth inconsistencies, and must discuss the *Polaski* factors."). Therefore, the Court finds that remand is appropriate for the ALJ to further develop the record with regard to Ciha's credibility. On remand, the ALJ shall set forth in detail his reasons for finding Ciha's subjective allegations to be credible or not credible. If on remand, the ALJ finds Ciha's testimony not to be credible, the ALJ is required to fully explain *in detail*, the reasons for his credibility determination and fully explain *in detail*, the inconsistencies between Ciha's subjective allegations and the evidence in the record.

### C. Reversal or Remand

The scope of review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides in pertinent part:

> The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing.

42 U.S.C. § 405(g). The Eighth Circuit Court of Appeals has stated that:

> Where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his [or her] disability by medical evidence on the record as a whole, we find no need to remand.

*Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir. 1987); *see also Beeler v. Brown*, 833 F.2d 124, 127 (8th Cir. 1987) (finding reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of disability"); *Stephens v. Sec'y of Health, Educ., & Welfare*, 603 F.2d 36, 42 (8th Cir. 1979) (explaining that reversal of denial of benefits is justified where no substantial evidence exists to support a finding that the claimant is not disabled). In the present case, the Court concludes that the medical records as a whole do not "overwhelmingly support a finding of disability." *Beeler*, 833 F.2d at 127. Instead, the ALJ simply failed to: (1) fully and fairly develop the record

32

with regard to the opinions of Dr. Brooks, Ciha's treating physician; and (2) properly consider Ciha's subjective allegations of pain and disability. Accordingly, the Court finds that remand is appropriate.

## VI. CONCLUSION

The Court concludes that this matter should be remanded to the Commissioner for further proceedings. On remand, the ALJ shall provide clear reasons for accepting or rejecting the opinions of Dr. Brooks, and support his reasons with evidence from the record. The ALJ must also consider all of the evidence relating to Ciha's subjective allegations of disability, address his reasons for crediting or discrediting those allegations, and properly apply the *Polaski* factors when determining Ciha's credibility.

## VII. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

This matter is **REVERSED** and **REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed herein.

DATED this 25ᵗʰ day of July, 2013.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA